PARKER v. DAVIS.

BROKERS—COMMISSIONS—PROCURING CAUSE OF SALE.
Whether real estate brokers were entitled to their commissions for procuring a purchaser for defendant's flat was a question of fact, upon testimony of the purchaser that she had no dealing with the brokers, that her husband, who had been looking for certain real property and had been shown the flat in question by plaintiffs, informed her of the flat, and she had dealt directly with

the owners: the question as to the procuring cause could not be determined as matter of law, because the brokers had shown the premises to the purchaser's husband, or upon the disputed testimony of plaintiff's solicitor that he had interviewed the wife and stated terms and the price asked by the defendants.[1]

Error to Wayne; Mandell, J. Submitted October 10, 1913. (Docket No. 15.) Decided December 20, 1913.

Assumpsit by Harry J. Parker and others, copartners as Parker, Schunk & Fry, against Oliver H. Davis and Ida Davis for brokers' commissions. Judgment for defendants. Plaintiffs bring error. Affirmed.

*Keena, Lightner, Oxtoby & Oxtoby,* for appellants.

*Fred H. Warren,* for appellees.

KUHN, J. The defendants were the owners of a duplex flat on Euclid Avenue West, in the city of Detroit. They lived downstairs and rented the upper flat. The property, when ready for occupancy, in August, 1908, was listed for sale with Harry J. Parker, who later became a member of the plaintiff firm, with whom the property was listed for sale at $7,000, exclusively, for three months, with 3 per cent. commission to be paid for its sale. Upon the expiration of the three months, the property was listed with other real estate firms and the price was reduced to $6,500. The plaintiffs advertised the property and showed it to various persons and, among others, to Mr. Arthur E. Root. Mr. Schunk, of the plaintiff firm, about October, 1909, called on Mr. Root, and they visited the property. Several weeks

[1] On the question as to when real estate broker is considered as procuring cause of sale or exchange, see note in 44 L. R. A. 321.

later, he claims he went to call on Mr. Root and met Mr. and Mrs. Root on a street car and talked with them about the sale of the property, and that is the only time, it is claimed, that he talked with Mrs. Root concerning it. Mr. Schunk claims he called on Mr. Root several times after that but did not make any deal with him. He then turned the property over to one of his salesmen, named Hungerford, who does not claim that he saw Mr. Root personally with reference to the property but claims that some time in the early part of 1910 he called at Mr. Root's residence and saw and had a talk with Mrs. Root about the flat and made a price of $6,500 on it. This is denied by Mrs. Root, who testified that she never saw him until they were in court as witnesses.

Mr. Root in December, 1909, bought another flat property and no longer considered purchasing the Euclid avenue flat. About that time Mrs. Root received some money from a relative. She testified that she never told the plaintiffs or any one connected with them that she was desirous of purchasing a flat, and the only real estate man she claims to have spoken to about making a purchase was a Mr. Moon, who tried to interest her in a flat on Westminster avenue in February, 1910. When she told her husband that she did not like this property, he said, "Why don't you go and look at the Davis flat?" Thereupon she did call at the Davis home, and they made her a price of $6,500 on it. She called there again, and it finally resulted in Mrs. Root purchasing the property for $6,400, and she made the first deposit of $200 on April 26, 1910. It was also agreed that the Davises were to have possession until June 1st, rent free, and they were not to be under any expense in bringing the abstract to date, so that it was figured that it was as good practically as receiving $6,500. No question is raised but that Mrs. Root purchased the property with her own money. This suit was brought to re-

cover a 3 per cent. commission on this amount. At the close of the proofs, counsel for plaintiffs made a motion to direct a verdict, but the matter in controversy was submitted by the court to the jury, and it resulted in a verdict of no cause of action.

The sole question raised in this appeal is, as stated in plaintiffs' brief:

"Whether or not, under the undisputed testimony in this case, plaintiffs were entitled to their commission upon the sale made by the defendants to Sarah Root."

As bearing upon the question of whether, under the undisputed evidence, the plaintiffs were the procuring cause of the sale to Mrs. Root, it is necessary to carefully examine her testimony. She testified with reference to her relations with the plaintiffs as follows:

"*Q.* How did you come to look at that flat?

"*A.* Mr. Root—I told Mr. Root I did not really like the flat on Westminster, and he said, 'Why don't you go and look at the Davis flat?' and I said, 'It is almost too much money;' and he said it would do no hurt to look at it; and when I went to look at the Westminster flat the second time I stopped and looked at the Davis flat. I found Mrs. Davis home. She made a price of $6,500. I looked through the flat from top to bottom. It was in March. From that time until the 26th of April I was not at the Davis flat. I don't think during that time anybody talked about selling me the Davis flat. My husband went with me that evening because I did not care to go alone. In the month of March or the 1st of April I finally concluded to buy, if I could get it at my price. The money was paid over and a receipt given, about 8 o'clock, nearly 8 in the evening. It was in the daytime about 11 o'clock in the forenoon that I first saw the Davis flat. I did the talking myself and Mr. and Mrs. Davis, so far as the bargain was concerned. I already made a bargain of $6,400 and they were to stay there until June 1st rent free, and I took the abstract as in the bank. The bargain was carried out. Mr. Hunger-

ford certainly never did call or talk to me about buying this flat. The first time I ever saw Mr. Hungerford to my knowledge was when this case was called on in the lower court. I didn't know the man until he was pointed out to me as Mr. Hungerford. Mr. Hungerford never called at our place and talked with me about this flat or left with me his card with a memorandum on the back of it and with the price and the street, number, etc. At that time there was another woman living at our house along in the spring of 1910, my sister-in-law. She has always lived with us until this last year. She was there. That was her home. Mr. Hungerford never saw me at the door of my house and talked about the flat. I don't think he did. If he did, I didn't know him. I would remember whether he left his card with a memorandum of the street and number, etc. He never did with me. I can't remember how many times I ever saw Mr. Schunk. I think three different times. I am safe in saying three different times. The first time is the time that Mr. Root went with him to look at the flat, when he wanted to shave before he went out. He came in the house and sat down and waited until he was ready to go. The next time was when he rode down in the car with us. I could not say whether he came in the house then, but I think he did, or he sat out on the porch. He was there, but whether he came in the parlor and sat down I would not say. The first time Mr. Schunk did not say a word to me about buying the flat. He was seeking to sell to Mr. Root. He asked for Mr. Root.

"*Q*. When he was there this time and you went down in the street car, did you talk about buying the flat?

"*A*. He didn't ask me if I intended to buy a flat. I didn't intend to. He was talking to Mr. Root.

"*Q*. Did you and Mr. Root and Mr. Schunk have any conversation of any kind or character about the purchase of the flat going down in the street car that day?

"*A*. I don't think we did. I don't remember any. Anything regarding the real estate was talked at the house, so far as I remember. I remember the third time that Mr. Schunk was there. I believe he called

there in the evening. It was just before Mr. Root had come home from work and I was getting dinner. I met him at the door, and I don't know what he said. I think he asked for Mr. Root and spoke about the real estate. I didn't spend time with him. I was busy. He didn't come in.

"*Q.* I want to ask you whether Mr. Hungerford— he has testified that he called on you and that he left you a card with a memorandum; that he was invited to the house and sat down inside the house and talked with you about 15 minutes.

"*A.* He never did with me. He never was invited in my house by me. If he was it was somebody else. I don't think any one ever invited him in. I don't think he was in my house. If he was invited in it was by some other woman. If it was some other woman it was my sister-in-law. No other real estate man or any other person outside of our own family knew that I wanted to buy a flat or was thinking of investing in real estate, except Mr. Moon. Nobody connected with the office of Parker, Schunk & Fry ever called on me or talked with me individually about buying a flat or made me a price on it. It was a direct deal between myself and the Davises.

"*Q.* When did your money become available for the purchase of this flat? (Objected to as immaterial.)

"*The Court:* I don't think it is material but you may answer it.

"*A.* My money at the time was in the Old Detroit Bank on certificate of deposit. There was some time waiting to carry it out. If I left it there at all I think it was the 21st of May. I would receive interest if I left it there, and if I took it out before I would lose the interest. My husband bought the flat on Bethune on the 9th of December, 1909. That is the date of the deed. So far as I know he was not in the market for a flat after he bought that, not for himself; he talked some to our son. Our son talked some of buying one. (Objected to.) But that was given up."

We are of the opinion that by this testimony a clear question of fact was raised as to whether the plaintiffs were the procuring cause of the sale. The plaintiffs were notified by Davis in January, 1910, that

they had "lost Root," as he had purchased other property.

It is not contended that either Mr. Schunk or Mr. Hungerford tried to sell to or considered Mrs. Root as an individual prospect on her own account, separate from her husband; but it is urged that a broker should be entitled to a commission when he deals with a husband and wife, believing the husband to be the prospective customer and the wife merely to be interested as such, and the wife subsequently concludes to buy on her own account. We do not believe that a definite rule can be laid down simply because of this relationship, and it should be decided by the facts in each case. No complaint is made as to the instructions of the court, and we are of the opinion that under the facts of this case the trial court was correct in holding that the controversy presented a question of fact for the jury. See *Brooks* v. *Leathers,* 112 Mich. 463 (70 N. W. 1099); *Wood* v. *Smith,* 162 Mich. 334 (127 N. W. 277), and the extensive review of the cases on controlling and moving cause in the note to the case of *Hoadley* v. *Savings Bank of Danbury,* 44 L. R. A. 321, 333 [71 Conn. 599]).

Judgment is affirmed.

STEERE, C. J., and MOORE, MCALVAY, BROOKE, STONE, OSTRANDER, and BIRD, JJ., concurred.